| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIOCESE OF KNOXVILLE, | ) | JURY TRIAL DEMANDED |
| | ) | |
| and | ) | NO.: 3:22-cv-401 |
| | ) | |
| ANTONY DEVASSEY PUNNACKAL, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARMELITES | ) | |
| OF MARY IMMACULATE, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMPLAINT

Defendant Father Antony Punnackal ("Defendant Punnackal"), a priest of the Defendant Diocese of Knoxville ("Defendant Diocese") and the Defendant Carmelites of Mary Immaculate ("CMI"), sexually assaulted and battered Jane Doe ("Plaintiff"), as part of his unsuccessful attempt to engage Plaintiff in commercial sex trafficking Plaintiff is an asylum-seeking, widowed mother of three children who sought grief counseling after the murder of her child's father. Defendant Punnackal committed the sexual assault and battery at a grief counseling meeting mere days after the murder occurred.

Defendant Diocese compounded the harm that Defendant Punnackal inflicted. Rather than cooperate with the investigation, Defendant Diocese obstructed law enforcement by (a) misleading police and (b) attempting to have Plaintiff arrested or otherwise discredited, and by acquiring sensitive records about the Plaintiff as part of a nearly-successful ploy to intimidate the Plaintiff into abandoning her cooperation with the criminal prosecution of Punnackal. Despite the Defendant Diocese's obstruction, Defendant Punnackal was indicted in January of 2022 by a Sevier County, Tennessee grand jury on two

1

charges of sexually battery of Plaintiff[1] in violation of Tennessee Code Annotated sections 39-13-527(a)(2) and 39-13-505(a)(3).

Accordingly, by and through undersigned counsel, Plaintiff brings the following complaint against the Defendants for the federal civil violations of attempted sex trafficking and obstruction of anti-trafficking enforcement, and the related state claims of sexual battery, intentional and negligent infliction of emotional distress, negligence, and negligent hiring, retention, and supervision.

## Parties

1.     **Plaintiff** is a resident of Sevier County, Tennessee. She was a parishioner of St. Mary's Catholic Church in Gatlinburg, Tennessee.

2.     Plaintiff is a Honduran national and a practicing member of the Catholic faith. Fleeing violence in Honduras, she immigrated to the United States in 2019, by legally entering as an asylum applicant at United States official point of entry. As required by United States law, Plaintiff filed for asylum. She then began to legally reside in Gatlinburg, Tennessee, as she awaited progress on her asylum application. The federal government has granted her the legal right to work in the United States. Plaintiff has been twice widowed in Honduras, and she remains the sole living parent for the children that she shared with her deceased husbands. Plaintiff has a credible fear of murder if she is denied asylum and she is returned to Honduras.

3.     Plaintiff speaks Spanish and has very limited English proficiency.

4.     Before Punnackal's assault and battery, Plaintiff lived with and successfully cared for her three children. Plaintiff already suffered from post-traumatic stress-disorder (PTSD) before her sexual assault and battery. Plaintiff's mental health was so heavily damaged by the Defendants' conduct, that she responsibly recognized that she needed assistance with their care.  She voluntarily transferred custody of

---

[1] Notably, Defendant Punnackal has continued access to additional vulnerable people as an active pastor for the Defendant Diocese at St. Mary's Church in Gatlinburg, Tennessee,

her children, on a temporary basis, to the government. She is in the process of recovering custody of her children.

5.     **Father Antony Devassey Punnackal**, ("Defendant Punnackal") is an ordained priest of the Defendant CMI and works for the Defendant Diocese of Knoxville. Defendant Punnackal was at the time of the events alleged herein, the priest for St. Mary's Catholic Church in Gatlinburg, Tennessee.

6.     St. Mary's Catholic Church is located at 304 Historic Nature Trail, Gatlinburg, Tennessee 37738, and is part of the Diocese of Knoxville.

7.     Defendant Punnackal does not speak Spanish.

8.     The **Diocese of Knoxville**, (the "Defendant Diocese") a corporation sole,[2] is a religious organization forming part of the Holy Roman Catholic Church and acts as the representative of his Holiness Pope Francis, Bishop of Rome, Vicar of Christ, and Supreme Pontiff of the Universal Church, in East Tennessee, including Sevier County. Upon information and belief, the Diocese's headquarters and principal place of business are within the City of Knoxville at 805 S. Northshore Drive, Knoxville, Tennessee

9.     The Defendant Diocese includes all Diocese employees and contractors, as well as lay volunteers exercising or influencing administrative oversight, policy creation, or executive decisions by the Defendant Diocese's clergy leadership.

10.    The Defendant Diocese's **Diocesan Review Board** reviews all of Defendant Diocese sexual abuse allegations and reports. The review board and its members are agents of the Defendant Diocese. The review board consists of attorneys, former law enforcement officers, and other professional persons familiar with the criminal investigatory process and capable of protecting the Defendant Diocese's interests.

---

[2] According to the IRS, a "'corporation sole' is a corporate form authorized under certain state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of the religious entity." Rev. Rul. 2004-27.

11.     Bishop Richard F. Stika is the senior most ecclesiastical leader of the Diocese of Knoxville and is responsible for directing all important policy and hiring decisions.

12.     The Defendant Diocese can be served by serving Bishop Richard F. Stika, at 805 S. Northshore Drive, Knoxville, Tennessee, or legal counsel.

13.     Defendant **CMI** is an international religious organization founded in India. Its United States agent is Fr. Sebastian Thekkedathu (Sr.), CMI (Superior), at 862 Manhattan Ave, Brooklyn, New York 11222.

14.     At all times, Defendant Punnackal served as an ordained Catholic priest at St. Mary's Catholic Church, and a member of Defendant Diocese and the Defendant CMI and an employee of either the CMI, the Defendant Diocese, or both.

15.     At all times, Punnackal was an agent and employee of the Defendant Diocese acting in his official capacity and in the scope of his employment.

16.     At all times, Punnackal was an agent of the CMI acting in his official capacity and the scope of his employment.

17.     Plaintiff had a fiduciary relationship with Defendants such that Defendants had a duty to disclose and not conceal material facts relating to the causes of action herein.

18.     At all times, all Defendants acted intentionally, knowingly, recklessly, or negligently.

### Jurisdiction and Venue

19.      This Court has jurisdiction under 28 U.S.C. section 1332, section 1367, and section 1331.

20.     Venue is proper pursuant to 28 U.S. Code § 1391.

### Facts

21.     Religious figures and members of the clergy occupy an honored position in their communities. However, it is very common for sexual predators to join the clergy, as a means of obtaining a position of trust and access to vulnerable victims that they then abuse for their prurient gratification. The sexual abuse scandals plaguing major religious organizations are well-known and widely acknowledged. The Defendant Diocese of Knoxville, like all Catholic dioceses, is keenly aware of its duty to prevent its

4

priests from using their position of trust to exploit and abuse vulnerable community members. The Defendant Diocese is supposed to have in place measures preventing and remediating any clergy sexual abuses.

22.     Defendant Punnackal was ordained as a Carmelite priest in Defendant CMI on or about December 29, 1992, in India. He immigrated to the United States where he served the Diocese of Amarillo at Immaculate Conception Catholic Church in the small town of Vega, Texas.

23.     Moving a priest to a new diocese is typically a slow, planned process. Parishioners need advance warning that their incumbent priest, a valued community member, will be leaving and time to make plans to welcome his successor. A Diocese's rapid transfer of a priest is an unusual occurrence, that suggest an urgent need to remove a priest from the diocese.

24.     The Official Catholic Directory publishes an annual listing of all Catholic priests. Because priest transfers happen with plenty of advance warning, a priest is almost never double listed as serving in two different dioceses. Such double listings only occur when transfer of the double-listed priests was unexpected and rapid.

25.     In 2010, Defendant Punnackal hastily left Texas, leaving so quickly and unexpectedly that the official Catholic directory double listed him as working in both the Diocese of Amarillo and the Diocese of Knoxville.

26.     Defendant Punnackal began working at a Diocese of Knoxville church in Cleveland, Tennessee and was later moved to a church in Crossville, Tennessee. However, when the Defendant Diocese finally announced Defendant Punnackal's arrival in its newsletter, it took the unusual step of not mentioning that Punnackal already worked for the Diocese. It instead misstated that he came directly from Texas to Crossville.

27.     Defendant Punnackal had been personally hired by Bishop Stika.

28.     In 2014, Defendant Punnackal left Crossville and transferred to St. Mary's Church in Gatlinburg, Tennessee.

29.     St. Mary's Church has a large community of undocumented or asylum-seeking Spanish-speaking immigrants.

30.     Noncitizens, such as undocumented immigrants and asylum seekers, particularly those lacking English proficiency, are uniquely vulnerable to exploitation and abuse. They live in fear of being deported or having their asylum claim denied should they have any contact with authorities.

### *Plaintiff seeks aid from Punnackal after the murder of her child's father.*

31.     By January of 2020, Plaintiff was struggling to support her family and, like many immigrants, having difficulty navigating the complexities of the United States' labyrinthine asylum system. As a Catholic, she turned to the church for support. It was through St. Mary's Church in the Defendant Diocese that she met her assailant, Defendant Punnackal.

32.     Although his ability to communicate with Plaintiff was hampered by a language barrier, Defendant Punnackal always met with Plaintiff privately. In this way, Defendant Punnackal began grooming Plaintiff for his eventual sexual assault and battery. Communicating through translation software on her mobile phone, she confided her problems in Defendant Punnackal.

33.     Defendant Punnackal immediately began grooming Plaintiff, incrementally escalating physical contact, as he accumulated information about her vulnerabilities in the form of unmet needs such as food, immigration aid, and personal support. He deepened her dependence upon him by promising continued support in the future from him and the Defendant Diocese. At their first meeting, he attempted to make physical contact with Plaintiff's body. Using funds provided by the Defendant Diocese, Defendant Punnackal also gave Plaintiff gift cards to buy food for her children.

34.     At their second meeting, Defendant Punnackal attempted to touch Plaintiff in a sexual manner. Plaintiff rebuffed Defendant Punnackal advances. Punnackal then offered to give Plaintiff money for her immigration case and to put her in touch with an immigration attorney. However, he required that she first meet with him in person again.

35.    When Plaintiff had fled to the United States, the father of her third child remained behind in Honduras to complete his terms as a government employee serving in a dangerous role.

36.    On February 13, 2020, he was killed in the line of duty.

37.    Bereaved, socially isolated, and with no other source of social support, Plaintiff texted Defendant Punnackal's bilingual church assistant at St. Mary's Church to setup a meeting with Defendant Punnackal for grief counseling.

38.    On or about February 17, 2020, Plaintiff arrived at the church for her meeting with Defendant Punnackal. The bilingual assistant led her into a room where Defendant Punnackal was waiting for her.

39.    Defendant Punnackal appeared absorbed by whatever he was viewing on his laptop when Plaintiff and the bilingual assistant entered the room. Defendant furtively closed the laptop. Evidence from his laptop would go on to play an important role in Defendant Punnackal's future arrest and indictment by local law enforcement.

40.    The bilingual assistant knew that Plaintiff's partner had been murdered. He also knew that Punnackal does not speak Spanish and would thus be unable to fully communicate with Plaintiff. Nonetheless, he left Plaintiff in the room with Defendant Punnackal and went so far as to shut the door behind him. He knew or should have known that Plaintiff was incapable of direct verbal communication with Defendant Punnackal. No explanation was provided to the plaintiff about why the person capable of translating for Plaintiff abandoned her with Defendant Punnackal.

41.    Defendant Punnackal locked the door to the room. Plaintiff's reaction to seeing this?

42.    Plaintiff attempted to show Punnackal the death memorial video of her slain partner, with his uniformed body lying lifeless on a concrete sidewalk and a bullet hole through his left eye.

43.    Defendant Punnackal ignored the video. He pointed to Plaintiff's breasts, asking in pantomime whether she had just given birth and had a baby.

44.    Plaintiff had indeed been nursing her infant third child, the same child whose father had just been murdered.

45. Without invitation or consent, Defendant Punnackal began fondling Plaintiff's breasts and buttocks.

46. Plaintiff tried to physically rebuff Defendant Punnackal, but he continued the sexual battery.

47. The locked doors prevented Plaintiff from leaving. She was intimidated into not leaving by Defendant Punnackal's status in the community, her fear that he might deny her further access to food for her family, and the fear that he might be able to use legal process against her, such as disrupting her asylum claim.

48. Defendant Punnackal eventually unlocked the doors and Plaintiff escaped.

49. The next day, Plaintiff told the pastor of a local church about Defendant Punnackal's assault and battery. Plaintiff was afraid to report the assault and battery to the police; she was a non-citizen Honduran who could not speak English, while her assailant was a priest of the Catholic Church. She reasonably believed that no one would believe her, or that Defendants would have her arrested or otherwise abuse the legal process to ensure her silence. The pastor convinced Plaintiff to report the assault and battery, explaining that the laws of the United States protect non-citizens and citizens alike.

50. Accompanied by the pastor, the Plaintiff reported the assault and battery to the Gatlinburg police. The police quickly began an investigation and seized Defendant Punnackal's computer for forensic analysis.

*The Defendant Diocese entirely ignored its own sexual assault policies in responding to Punnackal's sexual assault and battery of Plaintiff.*

51. Upon learning of the assault and battery, the Defendant Diocese convened its Diocesan Review Board.

52. The Defendant Diocese has an extensive policy covering its response to the sexual abuse of children and vulnerable adults entitled "20.1 Policy and Procedures Relating to Sexual Misconduct for the Diocese of Knoxville." *See* Exhibit 2. Under its policy, the review board must interview both parties when investigating an incident of sexual abuse.

8

53. The Defendant Diocese flouted this requirement, never contacting Plaintiff and only speaking to Defendant Punnackal.

54. Even that specious query in lieu of a dutiful investigation yielded conclusive evidence of Defendant Punnackal's misconduct. On information and belief, Defendant Punnackal confessed to sexual battery or sexual assault against the Plaintiff.

55. According to page eight of its sexual abuse policy, this admission should have triggered Defendant Punnackal's immediate suspension from his clerical position within the Diocese: "if there is sufficient evidence to conclude that sexual abuse has occurred, the Bishop shall . . . withdraw the accused from exercising the sacred ministry or from any ecclesiastical office or function . . . and prohibit public participation in the Most Holy Eucharist."

56. Despite his confession, the Defendant Diocese allowed and continues to allow Defendant Punnackal to remain in his position as priest of St. Mary's Catholic Church.

*Punnackal's sexual assault and battery inflicted devastating psychological damage on Plaintiff.*

57. Rather than provide the emotional support and spiritual guidance Plaintiff sought to help her cope with the murder of her child's father, Punnackal betrayed Plaintiff's trust through his sexual assault and battery.

58. The Defendant Diocese disregarded Plaintiff's true and correct allegations and took no corrective action or responsibility for the sexual assault committed by the Defendant Diocese's agent, Defendant Punnackal.

59. Plaintiff did not initially speak publicly about Punnackal's sexual assault. However, shortly after Punnackal's assault and battery, the local Latinx immigrant community was told that Plaintiff had falsely accused Punnackal of sexual assault.

60. Outside of the police and Plaintiff's immediate family, only the Defendant knew about Punnackal's sexual assault and battery of Plaintiff. On information and belief, the Defendant Diocese or

9

its agents first spread the rumor among its Latinx parishioners that Plaintiff had falsely accused Punnackal of sexual assault.

61.     Plaintiff was shunned and harassed. Men would make uninvited sexual advances, both at her work and even coming to her home. People would come to her home late at night and disturb or destroy decorations and furnishings outside of her front door.

62.     On information and belief, when later confronted by parishioners about Defendant Punnackal's sexual assault and battery of Plaintiff, the Defendant Diocese would justify not removing him from his position by disparaging Plaintiff as not credible.

63.     By failing to remove Defendant Punnackal in light of Plaintiff's report, Defendant Punnackal's confession, the ongoing local police investigation, and by telling the Latinx community that Plaintiff had made false allegations against him, the Defendant Diocese subjected Plaintiff to abuse, humiliation, and prevented her from seeking community support.

64.     Due to the sexual assault and battery by Defendant Punnackal and community abuse that the Defendant Diocese inflicted, Plaintiff began suffering from suicidal ideation and underwent psychological treatment at Helen Ross McNabb where she remained for three days.

65.     After the assault, Plaintiff has been hospitalized for mental health issues on multiple occasions, including an eleven day stay at Peninsula Behavioral Health.

66.     Plaintiff's mental health has been so severely damaged as to require her to voluntarily give custody of her children to the child protective services, further increasing her mental distress.

67.     The mental damage inflicted by Defendant Punnackal's sexual assault and battery and the Defendant Diocese's failure to protect her from this assault, remedy the damage inflicted by the assault, and active concealment of Defendant Punnackal's wrongdoing, left her incapable of dealing with the normal demands of life.

68.     Until January of 2022, Plaintiff was unaware of the capacity or need to file a civil action and had, by dint of the mental and psychological damage inflicted by Defendants, previously been incapable of filing such an action.

10

69. The Defendant Diocese's decision to disregard Plaintiff, refuse to provide any supportive services, take no action against Defendant Punnackal, inflicted independent and lasting mental and psychological damage on Plaintiff.

70. Plaintiff's distress was further exacerbated by Defendant Diocese and Defendant Punnackal's employment of a private investigator, described below, to intimidate Plaintiff into believing that her asylum claim would be denied if she were to testify against Punnackal.

### *The Defendant Diocese attempts to interfere in law enforcement's investigation and prosecution of Punnackal's sexual assault and battery.*

71. Sometime around March of 2020, shortly after or during the Defendant Diocese's internal investigation, an attorney member of the Diocesan Review Board called the law enforcement officers investigating Defendant Punnackal. The board member admitted that a sexual incident had occurred during the private meeting between Punnackal and Plaintiff, violating Defendant Diocese policy. On information and belief, the board member attempted to dissuade investigators from continuing to further investigate the event by falsely claiming that the assault and battery had in fact been a consensual encounter.

72. It is unclear *how* the Defendant Diocese knew which officers were investigating the case as the officers had not contacted the Defendant Diocese as part of the investigation.

73. Sometime in 2021, yet another member of the Diocesan Review Board called law enforcement officers. The board member, also an attorney, attempted to further discredit Plaintiff's account of the assault and battery by telling officers about a post she made on social media. The board member also attempted to gather information about the investigation and potential prosecution. Officers rebuffed that attempt.

### *On January 4, 2022, a Sevier County grand jury indicted Punnackal for sexually battering Plaintiff while knowing that she was mentally incapacitated.*

74.     The covid-19 pandemic slowed and delayed the specialized forensic investigators responsible for analyzing electronic evidence. It took two years for investigators to work through their backlog of cases and finally forensically examine Defendant Punnackal's laptop.

75.     On January 4, 2022, shortly after completion of the laptop's forensic examination, a Sevier County grand jury indicted Defendant Punnackal by sealed presentment for sexually battering Plaintiff, charging him on one count of sexual battery by an authority figure and one count of sexual battery. *See* Exhibit 1 (Sevier County Presentment No. 2022 CR-49).

76.     The grand jury presentment alleged that at the time of the assault(s), Defendant Punnackal "knew or should have known that . . . the victim was mentally defective and/or mentally incapacitated."

77.     Sevier County Presentment No. 2022 CR-49 is incorporated here by reference.


*The Defendant Diocese has a long history of enabling sexual predators.*

78.     Bishop Stika has led the Defendant Diocese since 2009.

79.     Previously, Stika served as a priest in the diocese of St. Louis, acting as vicar general and chancellor to Cardinal Justin Rigali, who was then Archbishop of St. Louis. Since 2018, the St. Louis diocese has been under investigation by the Missouri attorney general's office for its longstanding pattern—stretching back to the days of Stika and Rigali—of hiding sexual abuse and harboring predator priests.

80.     In 2019, the St. Louis Diocese released the names of 64 St. Louis priests with credible sexual abuse allegations.[3] Many of the listed priests overlapped with Stika and Rigali's time leading the St. Louis Diocese.

81.     Rigali retired to Knoxville, Tennessee, where he lives with Bishop Stika.

82.     Plaintiff first learned that the coverup of the sexual assault and battery was Defendant Diocese's common practice and policy when, on February 22, 2022, a John Doe plaintiff sued the Defendant Diocese and Bishop Stika alleging an intentional coverup by Defendant Diocese leadership of his sexual

---

[3] https://www.archstl.org/promise-to-protect/list-release

assault by a Diocese seminarian. *See* Pl. Comp. *Doe v. Catholic Diocese of Knoxville*, Case No. C-22-014622, Knox County Circuit Court. John Doe alleged that Bishop Stika had covered up the assault and personally defamed him by claiming that he, John Doe, had in fact sexually assaulted the seminarian.

83. Previously, Plaintiff had believed that her sexual assault and battery, its coverup and her shunning by the local community had been exclusively the work of Defendant Punnackal instead of an organized effort by the Diocesan Review Board and other members of Diocese leadership.

84. This pattern is so common that numerous people, mainly priests working for the Defendant Diocese, have complained to the Vatican, calling for an investigation.

### *The Defendant Diocese further attempts to interfere in the investigation and prosecution of Defendant Punnackal's sexual assault and battery.*

85. Plaintiff filed a civil suit against Defendants Punnackal and the Defendant Diocese in Sevier Court Circuit Court, on January 31, 2022.

86. After the filing of that suit, the Defendant Diocese hired a private investigator to uncover information that would coerce Plaintiff into dropping both her civil and criminal claims against Punnackal.

87. The investigator approached the Plaintiff's former employers, two restaurants and acquired copies of fake government identification purporting to belong to the Plaintiff but under a different name.

88. In the alternative, the private investigator acquired reason to believe that one or both restaurants had false records of Plaintiff, including copies of falsified identification.

89. One of the Defendant Diocese's agents, a member of the Diocesan Review Board, would later unlawfully acquire all of the Plaintiff's employment records, including records purporting to be official government identification and immigration records.

90. It is common practice for businesses employing undocumented or suspected undocumented immigrants to keep false records. These false records give a fake name and typically contained falsified records purporting to show that the employee is a citizen or otherwise authorized to work legally.

91.     In April of 2022, the private investigator working on behalf of the Defendant Diocese and Punnackal contacted the law enforcement officers investigating Defendant Punnackal. At this point, Defendant Punnackal had already been indicted. The investigator told the law enforcement officers that Plaintiff, their chief witness in Defendant Punnackal's criminal prosecution, had committed employment fraud by working under a false name, and asked for her to be arrested.

92.     Plaintiff became extremely distressed upon learning that Defendants possessed or claimed to possess information or records alleging that she had worked under a false name.

93.     Allegations of identity fraud—even unsubstantiated allegations—in employment history are common grounds for the denial of asylum claims. Denial of Plaintiff's asylum claim could result in her death. Defendant Punnackal knew she was seeking asylum. Because she had disclosed to him the nature of her partner's violent murder, he knew that she faced mortal danger if she were returned to Honduras. On information and belief, the Diocesan Review Board's members have previously dealt with undocumented persons and asylum seekers and understood and intended the threat conveyed by their actions.

94.     Because Plaintiff has applied for asylum, Immigration and Customs Enforcement ("ICE") can order her detained for any reason or no reason at all; even the allegation of employment fraud provides sufficient grounds for ICE to detain Plaintiff until the processing of her asylum claim.

95.     At her asylum hearing, even unsupported allegations of employment fraud or using a false name could provide grounds for the denial of her asylum application.

96.     Plaintiff was nearly intimidated into dropping both her criminal and civil claims.

97.     On information and belief, the Defendant Diocese acquired Plaintiff's employment records intending to either intimidate her into dropping both lawsuits or facilitating her arrest and deportation to a country where she would, like her partner, likely be murdered.

98.     What impact the Defendant Diocese's actions will ultimately have on Plaintiff's asylum case will only be determined at the asylum hearing itself.

***The Statute of Limitations on all state claims has been tolled by initiation of a criminal prosecution, Plaintiff's mental incapacity, and Defendants' fraudulent concealment and ongoing conduct.***

99.     At the time of the sexual assault and battery, the death of her child's father had already injured Plaintiff's mental health such that she was incapable of managing her day-to-day affairs and

100.     Rather than help her recover from her grief, the actions of Defendants caused her increased mental injury and suffering, preventing her from regaining control of her daily affairs or understanding her legal rights.

101.     Defendants misrepresented and concealed material facts for the purpose of concealing the abuse and concealing their role in enabling sexual abuse.

102.     Defendants' fraudulent concealment was intended to prevent public knowledge of the assault and battery and subdue further complaints against Defendants.

103.     Defendants are estopped from asserting any statute of limitations or statute of repose defenses which they may claim are applicable to this Complaint.

104.     Defendants' fraudulent concealment of Defendant Punnackal's sexual misconduct and fraudulent concealment of its own pattern and practice of enabling sexual assaults tolls any statute of limitations.

105.     Similarly, because the sexual assault and battery rendered Plaintiff incapable of managing her daily affairs or understanding her legal rights and Defendants knew of the assault and battery and refused to help Plaintiff or take reasonable steps to ameliorate the harm caused by Defendant Punnackal, Defendants are estopped from raising the statute of limitations or statute of repose to bar Plaintiff's claims.

106.     The statute of limitations and statute of repose are tolled because Defendants' actions—refusing to ameliorate, acknowledge, or investigate Defendant Punnackal's sexual assault and battery and the damage it inflicted—are an ongoing source of harm inflicting severe mental and emotional harm.

107.     The statute of limitations has been tolled by Plaintiff's mental instability under Tenn. Code Ann. Section 28-1-106, a condition related in part to the Defendants' actions complained of here.

15

108.     The statute of limitations has been tolled under Tenn. Code Ann. section 28-3-104(a)(2), by the commencement of a criminal investigation and prosecution against Defendant Punnackal.

109.     The statute of limitations has been tolled by Defendants' fraudulent concealment of the assault and battery and the Defendant Diocese's concealment of its pattern of facilitating sexual assaults by its employees.

110.     The statute of limitations has been tolled by Defendant Diocese's ongoing attempts to harass Plaintiff, have her arrested, and put her in fear of deportation.

## VICARIOUS LIABILITY

111.     Plaintiff incorporates each and every allegation contained above.

112.     At all times, the Defendant Diocese was an employer of Defendant Punnackal and Defendant Punnackal acted within the scope and course of his employment, actual or apparent, such that any negligent or tortious act committed by Defendant Punnackal can be imputed to the Defendant Diocese.

113.     Defendant Punnackal met Plaintiff acting in his role as priest of St. Mary's Church. He met with her at St. Mary's Church. He used the Defendant Diocese's funds to provide her with gift cards allowing her to feed her children. Punnackal used the Defendant Diocese's employees to setup his meetings with Plaintiff. Defendant Diocese employees, like the bilingual assistant, knew that Punnackal was privately meeting with Plaintiff, a person with whom he could not directly communicate because of a language barrier, and yet helped facilitate those meetings.

114.     In his attempt to traffic Plaintiff for sex, Defendant Punnackal offered Plaintiff money and resources to help with her immigration case. As a priest, Defendant Punnackal has taken a vow of poverty; the money and resources belonged to the Defendant Diocese.

115.     Defendant Punnackal's attorney is being paid by either the Defendant Diocese or its insurance company.

116.   The Defendant Diocese is therefore vicariously liable for the negligent acts and omissions of its agent and employee Defendant Punnackal as well as the negligent acts and omissions of its other agents and employees, such as the members of the Diocesan Review Board and the bilingual assistant.

117.   In the alternative, CMI was at all times the employer of Defendant Punnackal and Defendant Punnackal acted within the scope and course of his employment, actual or apparent, such that any negligent or tortious act committed by Defendant Punnackal can be imputed to the Defendant Diocese.

118.   Defendant Punnackal's actions can be attributed to CMI, rendering CMI also vicariously liable for his assault and battery and trafficking.

## DAMAGES

119.   As a direct result of Defendants' actions, Plaintiff sustained and continues to sustain the injuries and damages described herein:

   a.   Ongoing shame, humiliation, and embarrassment;

   b.   Severe emotional anguish and despair;

   c.   Severe anxiety, paranoia, depression, suicidal ideation, and trauma;

   d.   Flashbacks and intrusive thoughts;

   e.   Depression;

   f.   Loss of enjoyment of life;

   g.   Loss of professional and economic opportunities on account of the psychological damage inflicted by Defendants;

   h.   Difficulty in trusting others;

   i.   Loss of enjoyment of her children; also, irreparable injury to the parental bond.

   j.   Costs associated with treatment for her psychological injuries;

   k.   Other damages as may become apparent during the course of discovery;

   l.   Loss of spiritual community and guidance.

120.     Tennessee's statutory cap on punitive damages for non-economic injuries is unconstitutional, as held by the Sixth Circuit Court of Appeals and Tennessee courts and violates the right to a trial by a jury under both the United States Constitution and Tennessee constitution.

121.     In the alternative, because of the felonious nature of Defendant Punnackal's assault and battery, the Tennessee statutory cap does not apply under Tenn. Code Ann. section 29-39-102(h)(4).


## FEDERAL TRAFFICKING VICTIMS PROTECTION ACT

122.     The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et. seq.*, a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, on any persons engaging or *attempting to engage* or benefit from sexual exploitation and trafficking or obstructing anti-trafficking enforcement.

123.     Specifically, the TVPA punishes anyone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . .benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); *see* 18 U.S.C. § 1594 (prohibiting attempted trafficking and conspiracy to traffic).

124.     Coercion means "threats of serious harm to or physical restraint against any person . . .  any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

125.     "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

18

126.   Commercial sex act "means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C § 1591(e)(3).

127.   The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d), and makes it a separate offense to violate the TVPA while "possesse[ing] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person."18 U.S.C. § 1592(a).

128.   Every federal claim below incorporates all above paragraphs.

## TVPA Statute of Limitations

129.   Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c). All of the federal claims below are timely.

## FEDERAL COUNT I
## DFENDANT PUNNACKAL ATTEMPTED SEX TRAFFICKING PLAINTIFF IN VIOLATION OF 18 U.S.C. § 1591.

130.   Defendant Punnackal attempted to engage in sex trafficking of Plaintiff as prohibited under 18 U.S.C. § 1591; § 1594(a).

131.   Defendant Punnackal attempted to engage Plaintiff in a sex act in which she would trade him sex in return for access to food for her family and money and resources for her immigration case. In this instance the food for her family and money and resources for her immigration case, constitute things of value, as does the prospect of Defendant Punnackal's emotional support during a time of crisis. In this way, Defendant Punnackal's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under the TVPA. Because he is attempting to engage the Plaintiff in commercial sex using force, fraud, and/or coercion, he is attempting to engage her in sex trafficking.

132.    Defendant Punnackal engaged in a scheme or plan to traffic Plaintiff, luring her to St. Mary's Church with the promise of providing her counsel and guidance during her time of grief.

133. Defendant Punnackal coerced Plaintiff with his promise of help. Punnackal's promises were a plan designed to make Plaintiff believe that she would suffer serious harm should she not give in to his sexual advances. She would suffer the serious financial harm of having no assistance feeding her family or litigating her asylum claim; she could suffer the serious physical harm of having her asylum claim denied; she would suffer psychological harm by being cut off from her only potential source of emotional support and guidance during a time of grief.

134. Defendant Punnackal also used the coercive power of his status as a member of the clergy as well as physical force in his attempt to have Plaintiff engage in a commercial sexual act with him on February 17, 2020.

135. These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

136. Because Defendant Punnackal acted at all times in his role as priest, he acted as an agent of the Defendant Diocese and CMI, and Defendant Diocese and CMI are vicariously liable for his attempted trafficking of Plaintiff.

## FEDERAL COUNT II

### THE DEFENDANT DIOCESE AND ITS AGENTS OBSTRUCTED AND ATTEMPTED TO OBSTRUCT ANTITRAFFICKING ENFORCEMENT, INCLUDING PUNNACKAL'S CRIMINAL PROSECUTION.

137. The Defendant Diocese and Defendant Punnackal repeatedly obstructed or tried to obstruct the investigation of Defendant Punnackal's assault and battery on Plaintiff and his criminal prosecution.

138. The Defendant Diocese contacted law enforcement with false or misleading information in an attempt to prevent Punnackal's indictment.

139. The Defendant Diocese and Defendant Punnackal used a private investigator to access Plaintiff's employment records in an attempt to have Plaintiff arrested, alleging that she had committed employment fraud. This allegation could have—and may still yet—provide grounds for denying her asylum claim.

140. Defendant Diocese has no valid reason for wanting Plaintiff's employment records. The Defendant Diocese went after Plaintiff's employment records not because they had any bearing on the

sexual assault case, but because it knew that those records could be used to frighten and silence Plaintiff, an asylum-seeking immigrant.

141.  By trying to interfere with her asylum status, Defendants further attempted to obstruct the investigation and prosecution of Punnackal: if Plaintiff were deported and killed, there would be no witness against Punnackal.

142.  Defendants were almost successful; Plaintiff nearly withdrew from both lawsuits and fled the area out of fear that she could be deported.

143.  The Defendant Diocese constructed and maintains sexual abuse policies seemingly aimed at protecting victims, especially vulnerable adults like Plaintiff, from further harm, including removing suspected offenders from positions of power, and remedying injuries inflicted by predatory clergy. Supposedly to that end, the Defendant Diocese maintains a Diocesan Review Board as an apparently neutral body tasked with fairly and methodically investigating sexual assault allegations.

144.  In reality, these sexual abuse policies are little more than a smokescreen obscuring from parishioners and law enforcement the Defendant Diocese's unbridled hostility to sexual assault victims. There is no "reach[ing] out to victims/survivors and their families [to] demonstrate a sincere commitment to their spiritual and emotional well-being, seeking healing and reconciliation." Diocese Policy 20.1, page 9. There is no offer of therapy for the victim, paid for by the Defendant Diocese; no "right of a victim to maximum privacy:" no "right of the public to know information of a general nature;" no suspension of the alleged violator pending the outcome of formal proceedings. *Id.* at 9, 10.

145.  Instead, what happened to Plaintiff—and apparently other victims, too—is the deliberate, calculated marshalling of Diocese resources to delay, mislead, and obstruct investigations and discredit and isolate the victim.

146.  The Defendant Diocese knew of Defendant Punnackal's attempted trafficking and sexual assault and battery of Plaintiff. But it ignored its own policy of removing priests with credible sexual abuse allegations and instead tried to undermine Plaintiff's community standing and reputation, yet another attempt to pressure her into dropping her allegations against Punnackal.

147. This is exactly the kind of deliberate and sustained harassment and obstruction outlawed by the TVPA.

## FEDERAL COUNT III

### THE DEFENDANT DIOCESE OBSTRUCTED OR ATTEMPTED TO OBSTRUCT PUNNACKAL'S CRIMINAL PROSECUTION BY USING PLAINTIFF'S PURPORTED GOVERNMENT RECORDS IN ITS ATTEMPT TO SILENCE AND INTIMIDATE HER.

148. 18 U.S.C. § 1592(a) forbids the knowing "possesses[ion] [of] any other actual or purported government identification document, of another person" in the course of or with the intent to violate any trafficking statute, including attempts to obstruct antitrafficking enforcement.

149. The Defendant Diocese and Defendant Punnackal obtained Plaintiff's purported government identification documents from her former employees in order to obstruct or attempt to obstruct enforcement actions against Punnackal by intimidating her into silence. Without Plaintiff, there is no case against Punnackal.

## FEDERAL COUNT IV

### DEFENDANT DIOCESE BENEFITTED FROM DEFENDANT PUNNACKAL'S ATTEMPTED TRAFFICKING AND ITS AGENTS ATTEMPTS TO OBSTRUCT ENFORCEMENT OF THE TVPA.

150. The Defendant Diocese committed a separate actionable harm when it knowingly benefited from its agents', including Defendant Punnackal, violations of the TVPA. *See* 18 U.S.C. § 1593(a).

151. The Defendant Diocese knew that Defendant Punnackal had assaulted Plaintiff. The Defendant Diocese knew that its agents were obstructing and attempting to obstruct enforcement efforts against Punnackal.

152. The Defendant Diocese gained numerous financial and valuable benefits from protecting, participating, and aiding these TVPA violations.

153. By helping obscure Defendant Punnackal's sexual assault, such as by not making him step down from his clerical role or denying the truth of Plaintiff's allegations, the Defendant Diocese continued to

receive donations from parishioners that would have ceased were it known that the Defendant Diocese was succoring a sexual predator at the expense of his victim.

154. The Defendant Diocese also gained the value of Defendant Punnackal's services, services that would have been lost had he been forced to step down, as required by Diocese policy.

155. By aiding its agents in attempting to derail Punnackal's prosecution and Plaintiff's civil suit, the Diocese attempted to gain the cost of money spent on legal defense and judgments.

156. Finally, Defendant Diocese gained the financial benefit of writing off as a charitable donation all of the gift cards given to Plaintiff in Defendant Punnackal's attempt to groom her for his predation.


## STATE CLAIMS


## STATE COUNT I


## <u>SEXUAL ASSAULT</u>

157. Plaintiff incorporates each and every allegation contained above.

158. Using the power and trust of his position as a priest, counselor, and spiritual guide to Plaintiff, Punnackal engaged in an unwanted and offensive sexual touching of Plaintiff's person on or about February 17, 2020, at what was supposed to have been a private grief counseling session. Plaintiff did not invite or consent to these sexual acts.

159. Punnackal acted intending to cause a harmful contact with Plaintiff's person.

160. As a direct and proximate cause of Punnackal's actions, Plaintiff has suffered and will continue to suffer severe psychological distress, humiliation, loss of self-esteem, depression, and suicidal ideation.

161. The damages to Plaintiff would not have occurred but for the actions of Punnackal and the Defendant Diocese and its agents and employees.


## STATE COUNT II


## <u>BATTERY</u>

162. Plaintiff incorporates each and every allegation contained above.

163. Using the power and trust of his position as a priest, counselor, and spiritual guide to Plaintiff, Punnackal engaged in an unwanted and offensive sexual touching of Plaintiff's person on or about

23

February 17, 2020, at what was supposed to have been a private grief counseling session. Plaintiff did not invite or consent to Punnackal's sexual acts or touching.

164.    Punnackal intentionally and unlawfully touched Plaintiff's person in a harmful and offensive manner constituting the tort of battery.

## STATE COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY PUNNACKAL

165.    Plaintiff incorporates each and every allegation contained above.

166.    Punnackal caused Plaintiff severe emotional distress by intentionally luring Plaintiff to a sham grief counseling meeting and then locking her in a room and sexually assaulting her.

167.    Having a priest use fraud to falsely imprison a grieving parishioner for the purpose of sexually assaulting her is outrageous conduct that civilized society will not tolerate.

168.    As a result of Punnackal's intentional and outrageous conduct of sexually assaulting the grieving Plaintiff, she has suffered severe emotional distress, anxiety, and depression that resulted in her hospitalization on multiple occasions and other damages as described herein.

169.    This damage would not have occurred but for the actions of Defendants and their agents and employees.

## STATE COUNT IV

## FALSE IMPRISONMENT

170.    Plaintiff incorporates each and every allegation contained above.

171.    Punnackal lured Plaintiff into a room under the false pretense of offering a grief counseling session. Punnackal locked the door to that room before sexually assaulting and committing battery against Plaintiff.

172.    By locking the doors or otherwise preventing Plaintiff from leaving through physical force or coercion, Punnackal stopped the Plaintiff from being able to leave when his sexual assault began.

173. By intentionally and unlawfully confining Plaintiff in a room against her will for the purpose of accomplishing a sexual assault, Punnackal falsely imprisoned Plaintiff.

174. Because of this false imprisonment, Plaintiff was incapable of preventing Punnackal from sexually assaulting her and inflicting the damage described herein.

## STATE COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY THE DEFENDANT DIOCESE

175. Plaintiff incorporates each and every allegation contained above.

176. The Defendant Diocese intentionally caused Plaintiff severe emotional distress by; (1) its outrageous conduct of facilitating Punnackal's sexual predations; (2) allowing Punnackal to continue serving as the priest of St. Mary's Catholic Church despite knowing that he had sexually assaulted Plaintiff; (3) identifying to congregants that Plaintiff had falsely accused Punnackal of sexual assault, and; (4) unlawfully accessing Plaintiff's employment records in an attempt to threaten her asylum proceeding.

177. A bilingual diocese employee helped facilitate the assault by setting up a meeting between Punnackal and the Plaintiff despite knowing that the pair were mutually unintelligible and then leaving them alone in a locked room.

178. Civilized society will not tolerate a diocese willing to facilitate the sexual predation of its congregation by its clergy.

179. As a result of the Defendant Diocese's intentional and outrageous conduct of facilitating Punnackal's sexual assault and battery and then allowing him to continue serving as a priest despite knowing of the sexual assault and battery, Plaintiff suffered from severe emotional distress, anxiety, and depression that resulted her in hospitalization on multiple occasions and other harm described herein.

180. This damage would not have occurred but for the actions of Defendants and their agents and employees.

## STATE COUNT VI

## NEGLIGENCE

181. At all times, the Defendant Diocese owed a duty to Plaintiff to use reasonable care to ensure her safety, care, well-being, and health.

182. The Defendant Diocese's duties encompass preventing, identifying, and investigating the reasonably foreseeable danger of sexual assault and battery by a priest and otherwise providing a safe environment for Plaintiff and other parishioners at St. Mary's Catholic Church.

183. The Defendant Diocese breached these duties by failing to protect Plaintiff from the sexual assault and battery committed by its agent Punnackal.

184. At all times, the Defendant Diocese knew or should have known that Punnackal was unfit to be entrusted with the care of parishioners, especially vulnerable parishioners like Plaintiff. Despite such actual and constructive knowledge, the Defendant Diocese provided Punnackal with a position of authority and trust.

185. As a direct and proximate result of Punnackal's assaults, Plaintiff suffered severe and debilitating psychological and emotional damage.

186. After learning of the assault and battery, the Defendant Diocese failed to take adequate steps to remedy or address Punnackal's sexual assault of Plaintiff.

187. As a direct result of the Defendant Diocese's decision to ignore Plaintiff and allow Punnackal to remain an active priest, the Defendant Diocese inflicted further emotional and mental damage upon her.

188. The damages inflicted on Plaintiff would not have occurred but for the negligence of the Defendant Diocese and its agents and employees.

189. The Defendant Diocese ratified Punnackal's conduct by failing to discipline, investigate, or terminate him despite a credible allegation of sexual assault and battery.

190. The Defendant Diocese has failed to adopt adequate sexual abuse reporting, prevention, intervention and investigation protocols.

191. The Defendant Diocese failed to comply with statutes and regulations enacted for one or more classes of persons that include Plaintiff, enacted to prevent injuries of the type sustained by the Plaintiff, which imply a private right of action or impose liability under a negligence per se theory, including but not limited to statutes requiring the Defendant Diocese to report allegations of abuse to law enforcement.

192. The Defendant Diocese committed negligent entrustment by allowing Punnackal to use his position and Defendant Diocese property to sexually assault and battery Plaintiff.

193. The Defendant Diocese has also committed other negligent acts or omissions that may be discovered during the course of discovery.

## STATE COUNT VII

## NEGLIGENT HIRING, RETENTION, AND SUPERVISION

194. Plaintiff incorporates each and every allegation contained above.

195. At all times, the Defendant Diocese had a duty to Plaintiff to use reasonable care in ensuring her wellbeing, health, and safety while she was in the care, custody, or control of the Defendant Diocese and its agents.

196. That duty of care encompassed a duty to properly hire, retain, and supervise the Defendant Diocese's priests and other agents, including Punnackal, to prevent the reasonably foreseeable danger of sexual assault.

197. The Defendant Diocese knew that people seeking emotional support and spiritual guidance during times of personal crisis are vulnerable to sexual predation by the Defendant Diocese's priests.

198. The Defendant Diocese knew that people suffering from psychological duress and mental health issues are also vulnerable to sexual predation by the Defendant Diocese's priests.

199. The Defendant Diocese knew that noncitizens with limited English proficiency and PTSD are especially vulnerable to sexual predation by the Defendant Diocese's priests.

200. On information and belief, the Defendant Diocese knew or should have known that Defendant Punacckal would use his position to target vulnerable parishioners for sexual predation.

201.    The Defendant Diocese acted negligently by having initially hired Punnackal; failing to train staff to supervise visits between vulnerable parishioners and clergy, failing to supervise Punnackal and leaving him alone with vulnerable parishioners, failing to adequately investigate his sexual assault and battery of Plaintiff, and failing to provide remedial training, and failing to implement the Defendant Diocese's sexual assault policies and procedures upon learning of his assault against Plaintiff.

## **PRAYER FOR RELIEF**

Wherefore, premises considered, Plaintiff sues the Defendants for damages for the injuries described and prays for judgment and an award of compensatory and punitive damages against the Defendants for no less than $5,000,000.00 and for all such other relief, both general and specific to which she may be entitled under the premises, as follows:

1. For general and compensatory damages for past, present, and future psychological and emotional pain, suffering, distress, and injury;

2. Loss of enjoyment of life;

3. Loss of earning and of earning capacity;

4. For punitive damages against Defendants;

5. For attorney fees, court costs, and interest;

6. For any other relief this Court deems proper.

Respectfully submitted this 10th day of November 2022.

/s/ Andrew Fels_____
Andrew Fels, Esq. BPR #036005
3214 Fountain Park Blvd.
Knoxville, TN 37917
865-567-4881
andrewchristianfels@gmail.com

/s/ Rachel Bonano

Rachel Bonano, Esq. BPR 030458
Law Office of Rachel Bonano, PLLC
865 Ebenezer Road
Knoxville, TN 37923
Tel. (865) 282-5309
Fax (865) 251-5383
rbonano@bonanolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on November 10, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular United States Mail, postage prepaid, or hand delivery. Parties may access this filing through the Court's electronic filing system.


Andrew M. Hale (BPR #036815)
**KRAMER RAYSON LLP**
800 S. Gay Street, Suite 2500
Knoxville, TN 37929
(865) 525-5134
ahale@kramer-rayson.com
***Attorney for Defendant Catholic Diocese of Knoxville***


Travis McCarter, Esq.
**GREEN WATERS OGLE MCCARTER**
117 Court Ave.
Sevierville, TN 37862
(865) 429-3600
travis@gwofirm.com
***Attorney for Defendant, Fr. Antony Punnackal***


Fr. Sebastian Thekkedathu (Sr.), CMI (Superior)
862 Manhattan Ave,
Brooklyn, New York 11222.


/s/ Andrew Fels
Andrew Fels, Esq. BPR #036005
3214 Fountain Park Blvd.
Knoxville, TN 37917
865-567-4881
andrewchristianfels@gmail.com

30